IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                          Case No: 4:22cr43-AW-MAL

PHILLIP TIMOTHY HOWARD
_____/

## GOVERNMENT'S TRIAL BRIEF

The United States of America represents that it has discussed the legal and factual issues with the Defendants' attorneys pursuant to N.D. Fla. Loc. R. 26.2(G)(1). The Government offers the following as required, in part, by N.D. Fla. Loc. R. 26.2(G), and to prepare this Honorable Court for the trial scheduled to commence on August 7, 2023:

### I.    DISCOVERY MATERIAL / WITNESS & EXHIBIT LISTS

a.    The Government represents that it has provided the Defendant with all required discovery, including any known *Brady* and *Giglio* material.

b.    The parties have exchanged their respective trial witness lists and exhibit lists, and have exchanged their trial exhibits as agreed.

c.    The Defendant has not provided notice of any enumerated defense, as required by N.D. Fla. Loc. R. 26.2(F).

## II.    STIPULATIONS

a.    Counsel for the parties have conferred in-person about the Government's trial exhibits. Counsel for the Defendant have indicated that they had no authenticity or foundation objections to some of the Government's trial exhibits, nor do they object to the introduction of some of those exhibits. The parties are working toward executing a written stipulation in this regard prior to trial.

b.    The parties have agreed to several factual stipulations, which are expected to be memorialized in a separately-filed written stipulation prior to trial.

## III.   CHARGES IN THE INDICTMENT

The Indictment, returned October 4, 2022, charges the Defendant with one count of violating the Racketeer Influenced and Corrupt Organizations Act ("substantive RICO"[1]), related to the operation of his law firm and several investment-related companies ("the Enterprise"), in violation of 18 U.S.C. § 1962(c). ECF No. 1. The Indictment alleges that the Defendant did so by conducting and participating in the affairs of the Enterprise through a pattern of racketeering activity between on or about December 1, 2015, and on or about January 18, 2018. *Id.* The pattern of

---

[1] As opposed to a RICO Conspiracy, which is set forth at 18 U.S.C. § 1962(d).

racketeering activity is alleged to have consisted of 26 predicate acts involving wire fraud and engaging in monetary transactions in property derived from specified unlawful activity ("money laundering"), in violation of 18 U.S.C §§ 1343 and 1957, respectively. The predicate acts are grouped in the Indictment into four categories based on the type of victim: 1) former NFL players who were clients of the Defendant and who were otherwise investors in the Defendant's investment-related companies;[2] 2) a third-party settlement advance lender;[3] a third-party litigation funding lender;[4] and an investor who was not a former NFL player nor a client of the Defendant's law firm.[5]

## IV.   LEGAL OVERVIEW

### A.   The Racketeer Influenced and Corrupt Organizations (RICO) Act

RICO was enacted October 15, 1970, as Title IX of the Organized Crime Control Act of 1970. See Pub. L. No. 91-452, 84 Stat. 941 (1970). By enacting RICO—in response to the growing threat from organized crime—Congress "clearly demonstrate[d] that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States*, 464 U.S. 16, 26-27 (1983). "Despite its

---

[2] Racketeering Acts 1, 2, 3a-3c, 4a-4c, 5, and 6a-6c.
[3] Racketeering Acts 7, 8a-8b,9, and 10.
[4] Racketeering Acts 11a-11c,12a-12b, and 13a-13b.
[5] Racketeering Acts 14-15.

name and origin, RICO is not limited to 'mobsters' or members of 'organized crime' as those terms are popularly understood. Rather, it covers those activities that Congress felt characterized the conduct of organized crime, no matter who actually engages in them." U.S. Congressional Research Service. RICO: A Brief Sketch at 1 (96-950; August 3, 2021),

https://crsreports.congress.gov/product/pdf/RL/96-950 (Accessed: June 20, 2023).

Here, the Defendant is charged with substantive RICO under 18 U.S.C. § 1962(c), which makes it unlawful:

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

Thus, to prove a substantive RICO, the Government must establish:

(1)    the Defendant was associated with an enterprise;

(2)    the Defendant knowingly committed, or aided and abetted in committing, at least two acts of racketeering activity;

(3)    the two acts of racketeering activity were connected by a common scheme, plan, or motive constituting a pattern of criminal activity, and not just a series of separate, isolated, or disconnected acts;

(4)    by committing the two or more connected acts, the Defendant participated in conducting the enterprise's affairs; and

(5)    the enterprise was involved in or affected interstate commerce.

Eleventh Circuit Pattern Instruction OI # 75.1; *see also United States v. Young*, 906 F.2d 615, 619 (11th Cir. 1990). Terms used in the RICO statute, and its related jury instruction, are defined at 18 U.S.C. § 1961.

A RICO enterprise may be devoted to entirely legitimate goals or to totally corrupt ones. *See, generally, United States v. Turkette*, 452 U.S. 575, 580-93 (1981). In other words, "the activity of a RICO enterprise need not be entirely illegal." *United States v. Console*, 13 F.3d 641, 653 (3d Cir. 1993). Here, the Enterprise with which the Defendant associated was his law firm (Howard and Associates, P.A.) and investment companies (collectively referred to as "The Cambridge Entities" in the Indictment). ECF No. 1 at ¶¶ 8-16, 19.

The requirement of association with the enterprise is not strict. *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002). "The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir.1978). Thus, the RICO statute applies to individuals at all levels of involvement with an enterprise, and "seeks to encompass those people who are 'merely 'associated with'' the enterprise." *Id*.; *see also United States v. Watchmaker*, 761 F.2d 1459, 1476 (11th Cir.1985). Further, "the defendant need not occupy a *leadership* position in order to be associated with the enterprise; lower rung participants and outsiders who conduct the affairs of the enterprise may be associated with the enterprise as well." *United States v. Starrett*,

55 F.3d 1525, 1551 (11th Cir. 1995) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993)). "A defendant must know *something* about his co-defendants' related activities which make up the enterprise, but it is not necessary that he be aware of all racketeering activities of each of his partners in the enterprise." *United States v. Martino*, 648 F.2d 367, 394 (5th Cir. 1981).

RICO defines a "pattern of racketeering activity" as "requir [ing] at least two acts of racketeering activity" occurring within certain time frames. *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 769 (8th Cir. 1992) (citing 18 U.S.C. § 1961(5)). To be considered a "pattern," proof is required that "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* Predicate acts can be considered "related" when the acts are similar in method, purpose, and result, and continuity among predicate acts may be demonstrated "by proving a series of related predicates extending over a substantial period of time." *Id.* (internal citations removed). Continuity can also exists if "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* "Ultimately, the existence of a pattern is a question of fact." *Id.* To constitute "racketeering activity," the predicate offenses need only be *committed*; there is no requirement that the defendant or anyone else have been convicted of a predicate offense before a criminal RICO prosecution may be brought. RICO: A Brief Sketch at 12. Here, the indictment alleges that the Defendant's "racketeering

activity" was comprised of multiple acts of wire fraud and money laundering—both of which are qualifying RICO predicate acts. *See* 18 U.S.C. § 1961(1)(B).

As noted above, the Government can prove the Defendant's guilty either by establishing that the Defendant knowingly committed at least two acts of racketeering activity, *or* that he aided and abetted in committing at least two acts of racketeering activity. The substantive RICO statute (18 U.S.C. § 1962(c)) criminalizes even "indirect" participation in a pattern of racketeering activity; therefore, a person may be liable under section 1962(c) by means of aiding and abetting the pattern of predicate acts. *Rodriguez v. Banco Cent.*, 727 F. Supp. 759, 773–74 (D.P.R. 1989). Aiding and abetting is not a substantive charge, and just as with RICO conspiracy charges, the Government does not have to prove that two predicate acts of racketeering were committed by a defendant. *See United States v. Vendetti*, No. 10-CR-00360-RJA-JJM, 2013 WL 5522860, at *9 (W.D.N.Y. Jan. 22, 2013) (citing *United States v. Wyatt*, 807 F.2d 1480, 1482 (9th Cir.))

"To satisfy the interstate commerce requirement, only a slight effect on interstate commerce is required." *United States v. Beasley*, 72 F.3d 1518, 1526 (11th Cir. 1996) (citing *United States v. Norton*, 867 F.2d 1354, 1359 (11th Cir.)). Here, the evidence at trial will show that, *inter alia*, the Defendant and his (unindicted) coconspirators used interstate communication facilities (*e.g.*, email) to communicate with each other and victims in furtherance of their crimes, as well as

used and caused to be used interstate wire transfers between financial institutions to acquire the proceeds of their crimes.

## V.    ANTICIPATED TESTIMONY AND EVIDENCE

Trial in this matter is scheduled to begin on August 7, 2023. At trial, the government plans to call numerous witnesses who will establish the charged RICO enterprise—including its structure and hierarchy. The government will offer witness testimony, media, bank records, emails, and the Defendant's own statements to establish his membership in or association within the enterprise, and his participation in the charged racketeering activity. The evidence will establish that the Defendant was founder and leader of his law firm and the Cambridge Entities. The evidence will also show that even after the Defendant "divested himself" of any interest in The Cambridge Entities (which was really only on paper), the Defendant was still involved in its operations. The trial evidence will establish that most of the victims' money was used to further the goals of the Enterprise, which included the continuation of the Ponzi scheme.  Some of the victims' money was also used to purchase real estate in the Defendant's name.

The government also plans to present testimony of an expert witness—an attorney employed by Financial Industry Regulatory Authority (FINRA)—to explain the nature and structure of the securities markets, as well as the roles of the Securities and Exchange Commission (SEC) and FINRA in regulating the trading

of securities of public companies and investment advisors. This expert is also expected to provide the jury with background information akin to "Investment and Securities 101" in which he will explain concepts and terminology related to investments and securities, and types thereof. Further, this expert is expected to testify about the federal laws which govern the registration and sale of securities, and the subsequent trading thereof, and federal laws that regulate and define the role and responsibilities of an investment adviser and investment companies. This expert is also expected to educate the jury about Ponzi schemes and common "red flags" which exist in financial fraud schemes.

Some of the Government's anticipated trial exhibits will contain personally identifiable information ("PII") including dates of birth and social security numbers. Due to the volume of exhibits, it is not feasible for the Government to accurately redact PII contained in its exhibits. Rather, to help the Court determine which trial exhibits ought to be filed under seal, the Government will identify which of its exhibits may contain PII.

## VI.   BASES FOR THE ADMISSIBILITY OF THE GOVERNMENT'S ANTICIPATED EVIDENCE

### A.   Authentication of Evidence

As a condition precedent to the admission of evidence, the proponent of that evidence must satisfy the requirements for authentication. To do so, Federal Rule of Evidence 901 requires the proponent to "produce evidence sufficient to support

a finding that the item is what the proponent claims it is." The Fourth Circuit has explained that "[t]he burden to authenticate under Rule 901 is not high—only a prima facie showing is required." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). That is because "[t]he factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *Id.* (citing *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992)). "The government only needs to present 'some competent evidence' to support authentication, and that evidence can be purely circumstantial." *United States v. McNeal*, 591 F. App'x 760, 765 (11th Cir. 2014) (quoting *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir.1990)); *see also United States v. Lopez*, 758 F.2d 1517, 1520-21 (11th Cir. 1985) (per curiam) (holding there was "ample circumstantial evidence to infer that the fingerprints on the card . . . [were] those of the defendant").

The most common way to authenticate a piece of evidence is through testimony by a witness with sufficient knowledge that the matter is what it is claimed to be. Fed.R.Evid. 901(b)(1). Many of the documents the United States will seek to introduce will be authenticated through that method. In addition, there may be documents for which no witness will be able to recall that the document was authored or received by him or her, despite the witness's name being on the document. The United States may nevertheless properly authenticate such an exhibit pursuant to Rule 901(b)(4), which permits authentication when "[t]he

appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," support a finding that the document is what the proponent claims it to be.

However, much of the evidence anticipated to be introduced during trial will qualify as "self-authenticating" pursuant to Fed. R. Evid. 902. Such evidence will consist of domestic public documents that are sealed and signed (Fed. R. Evid. 902(1)), or that are not sealed but are signed and certified (Fed. R. Evid. 902(2)), and certified domestic records of a regularly conducted activity (Fed. R. Evid. 902(11)). Through discovery, the Government has disclosed to the defense such business records for which an executed certification that meets the requirements of Fed. R. Evid. 803(6)(A)-(C) exists. The parties have agreed to stipulate to the authenticity of a majority of the documents that the Government intends to introduce during trial through a certification of authenticity.

### B.    Summary Charts and Diagrams

The government intends to present several summary charts and diagrams to prove the content of voluminous documents that cannot be conveniently examined in court. Federal Rule of Evidence 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."

Longstanding precedent in this Circuit establishes that "[s]ummary charts are

admissible if they aid the jury in ascertaining the truth." *United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997) (citing *United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir. 1995)); *see also, e.g.*, *United States v. Whitfield*, 590 F.3d 325, 365 (5th Cir. 2009) (finding no abuse of discretion where the district court admitted summary charts that "synthesized bank records and checks" that demonstrated "the transfer of money" between participants in the conspiracy); *United States v. Massey*, 89 F.3d 1433, 1441 (11th Cir. 1996) (in a case involving bribery and other offenses, finding no error in the admission of summary charts detailing thousands of dollars in meals that the defendant purchased for a public official).

Here, some summary charts will trace the fraud proceeds from the victims to bank accounts of the Enterprise, and from bank accounts of the Enterprise elsewhere. Such charts are intended to aid the jury by summarizing, in a single comprehensible document or diagram, evidence that will be offered in documentary form and through both lay and expert witness testimony, but that would be difficult for the jury to comprehend in its "raw" form. The government disclosed the proposed summary charts to the defense on July 24, 2023.

### C.     Application of the Hearsay Rules

Several evidentiary issues that may arise during trial involve application of the hearsay rules. The government previews these issues below.

### 1.     Statements Not Offered for the Truth of the Matter Asserted

Testimony is not hearsay when it is not offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c)(2); *United States v. Jiminez*, 564 F.3d 1280, 1287 (11th Cir. 2009). Statements which provide necessary background information but are not offered for their truth are admissible under Fed. R. Evid. 801(c). *See, e.g.*, *United States v. Hoffpauir*, 209 F. App'x 969, 971 (11th Cir. 2006) (per curiam) (agent's testimony regarding anonymous letter admitted to explain why officers obtained search warrant was "admitted for the limited purpose of establishing the background of an officer's actions" and was "not hearsay"). Out-of-court statements offered for the purpose of explaining why a testifying witness did something are not hearsay. *See, e.g.*, *Jiminez*, 564 F.3d at 1288 ("[T]he law in this Circuit has long recognized that statements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions, and the probative value of the evidence's non-hearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by the impermissible hearsay use of the statement.") (internal quotation marks and alteration omitted). Statements to officers generally . . . may be admitted as non-hearsay for the limited purpose of explaining the background of the officers' actions if the admission of such statements is not overly prejudicial." *United States v. Jacques*, 266 F. App'x 824, 827 (11th Cir. 2008) (per curiam) (holding government agents' testimony

regarding what they learned from cooperating source was non-hearsay).[6]

## 2.      Statements of the Defendant

The Government will introduce many statements made by the Defendant in different circumstances (*e.g.,* in text messages, in emails, made verbally to victims and others). Such statements are admissions of a party opponent and are therefore excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A).

However, a defendant may not introduce his own statement—a defendant's prior statement is not hearsay only if offered against him. *See* Rule 801(d)(2)(A) (statements made by and "*offered against* an opposing party" are not hearsay) (emphasis added). A defendant's attempt to place before the jury an allegedly exculpatory statement made at the time of his arrest without subjecting himself to cross-examination is "precisely what is forbidden by the hearsay rule." *United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985) (per curiam) (holding remarks were "unquestionably hearsay"); *see also United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999) (*Willis* precluded defendant's attempt to question law enforcement agent about defendant's allegedly exculpatory remark

---

[6] *Jacques* relies on *United States v. Baker*, 432 F.3d 1189, 1208 n.17 (11th Cir. 2005), for this proposition. Although parts of *Baker*'s Confrontation Clause discussion were abrogated by *Davis v. Washington*, 547 U.S. 813 (2006), cases decided after *Davis*, including *Jacques*, have reiterated the holding cited above. *See United States v. Thompson*, 568 F. App'x 812, 821 (11th Cir. 2014) (per curiam); *see also id.* at 817 n.2 (explaining *Davis*'s effect on *Baker*).

and rejecting admission under different hearsay exception); *United States v. Vernon*, 593 F. App'x 883, 890 (11th Cir. 2014) (per curiam) ("[T]he district court properly prevented [the defendant] from admitting exculpatory statements through Nelson's testimony without subjecting himself to cross-examination."); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) (per curiam) (district court properly sustained government's hearsay objection to defendant's attempt to solicit defendant's post-arrest statements during cross-examination of FBI agent). There simply is no mechanism in the Federal Rules of Evidence for defendants to offer their own hearsay statements. By the same token, the Defendant cannot introduce statements made by their co-conspirators under the co-conspirator exception, discussed *infra*. *See* Fed. R. Evid. 801(d)(2)(E) (statement is not hearsay if "*offered against* an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy" (emphasis added)).

### 3.    Statements in Furtherance of the Conspiracy

Many of the statements that the Government intends to introduce are statements by uncharged coconspirators made during and in furtherance of the conspiracy. Under Federal Rule of Evidence 801(d)(2)(E), such statements are excluded from the definition of hearsay.

"In order for evidence to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence: (1) that a conspiracy

existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement was made during the course and in furtherance of the conspiracy." *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002); *United States v. Underwood*, 446 F.3d 1340, 1345-46 (11th Cir. 2006). The court may consider both the co-conspirator's hearsay statement and independent outside evidence in determining the admissibility of the of the co-conspirator statements. *Bourjaily v. United States*, 483 U.S. 171, 180-81 (1987); *see also United States v. Byrom*, 910 F.2d 725, 735 (11th Cir. 1990) ("[T]he district court may analyze a coconspirator's hearsay statement as evidence of the conspiracy.").

Federal Rule of Evidence 801(d)(2)(E) does not require co-conspirators to be defendants charged in the indictment. *See United States v. Magluta*, 418 F.3d 1166, 1179 n.5 (11th Cir. 2005); *United States v. Bowe*, 221 F.3d 1183, 1193-94 (11th Cir. 2000) (rejecting defendant's argument that the rule only applied to charged conspiracy) ("In fact, it is Bowe who takes too *narrow* a view of Rule 801(d)(2)(E), because the conspiracy that forms the basis for admitting a co-conspirator's out of court statements need not be the same conspiracy for which the defendant is charged."); *see also United States v. Salisbury*, 662 F.2d 738, 740 (11th Cir. 1981) (statements of a coconspirator may be introduced into evidence even though the government has not charged the defendant with conspiracy, as

long as the existence of the conspiracy has been properly established), *United States v. Ziperstein*, 601 F.2d 281, 294 (7th Cir. 1979) ("[I]t is well established that co-conspirators need not be indicted, and a fortiori need not be named, for the exception to be applicable."). Moreover, the Government is "not required to demonstrate unavailability of a co-conspirator declarant" for his statements to be admissible through another witness. *Byrom*, 910 F.2d at 735.

The Eleventh Circuit applies "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." *United States v. Ramirez*, 658 F. App'x 949, 953 (11th Cir. 2016); *see also United States v. Moore*, 611 F. App'x 572, 577 (11th Cir. 2015). "The statement need not be made by one conspirator to another conspirator" to be admissible. *United States v. Manfre*, 368 F.3d 832, 837 (8th Cir. 2004) (citing *United States v. Frazier*, 280 F.3d 835, 848 (8th Cir. 2002)). Statements "need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." *Miles*, 290 F.3d at 1351. For instance, statements that "explain[] the conspiracy to a new member," *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir. 1989) or "inform [co-conspirators] of the current status of the conspiracy," *United States v. Siegelman*, 640 F.3d 1159, 1181 (11th Cir. 2011) (per curiam) (internal quotation marks omitted), have been held considered to be in furtherance of the conspiracy. *See also United States v. Holt*, 777 F.3d 1234, 1267 (11th Cir. 2015) ("[A] statement that was necessary to keep a

co-conspirator abreast of the conspirator's current status is in furtherance of the conspiracy."). Even if a defendant was arguably not yet a member of a conspiracy when a co-conspirator made certain statements, statements of co-conspirators are admissible against members of the conspiracy who joined after the statements were made. *United States v. Lampley*, 68 F.3d 1296, 1301 (11th Cir. 1995).

However, "admissibility under Rule 801(d)(2)(E) does not turn on the criminal nature of the endeavor. *See United States v. Postal*, 589 F.2d 862, 886 n. 41 (5th Cir.1979)[7]." *United States v. El-Mezain*, 664 F.3d 467, 502 (5th Cir. 2011), as revised (Dec. 27, 2011). "Instead, a statement may be admissible under Rule 801(d)(2)(E) if it is made in furtherance of a lawful joint undertaking." *Id.* "One can qualify as a 'joint venturer' for the purposes of Rule 801(d)(2)(E) merely by engaging in a joint plan—distinct from the criminal conspiracy charged—that was non-criminal in nature." *Id.* (citing *United States v. Holy Land Found. for Relief & Dev.*, 624 F.3d 685, 694 (5th Cir.2010)); *see also United States v. Saimiento–Rozo*, 676 F.2d 146, 149 (5th Cir.1982) (noting that under Rule 801(d)(2)(E) there is no "need [for] the conspiracy or agreement [to] be criminal in nature; it may be in the form of a joint venture"). "Pursuant to this "joint venture" theory, a statement is

---

[7] "[D]ecisions of the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981)

not hearsay if it was made during the course and in furtherance of a common plan or endeavor with a party, regardless of the non-criminal nature of that endeavor." *Id.*; *see also Gov't of Virgin Islands v. Brathwaite*, 782 F.2d 399, 403 (3d Cir. 1986) (it is not required that the joint venture be "criminal or otherwise unlawful").

District courts have discretion to permit evidence to proceed chronologically and to allow the Government to introduce co-conspirator statements before establishing the conspiracy and the defendant's connection to it.  *United States v. Allison,* 908 F.2d 1531, 1534 n.2 (11th Cir. 1990) (court "can admit the statements subject to the government later connecting them up with sufficient evidence" (internal quotation marks omitted)); *United States v. Norton*, 755 F.2d 1428, 1431 (11th Cir. 1985); *United States v. Haimowitz*, 725 F.2d 1561, 1575 (11th Cir. 1984).  This Court may therefore allow the Government to introduce co-conspirator declarations before laying the required foundation on the condition that the evidence must be "connect[ed] up."  *Norton*, 755 F.2d at 1431.

   **D.     Surreptitious Audio Recordings**

One of the victims of the Defendant secretly audio-recorded their conversation and that of one of the Defendant's business partners, and those recordings may be introduced by the Government as evidence during trial. Florida law provides that no part of the contents of intercepted oral communication may be received in evidence in any trial. Fla. Stat. § 934.06. In anticipation that the

defense may try to exclude this recording as being obtained in violation of Florida law, the Government notes that federal law does not require exclusion. Specifically, "it is well settled that federal law governs the admissibility of tape recordings in federal criminal cases," and complaints that the evidence was obtained in violation of state law are of no effect." *United States v. Butera*, 677 F.2d 1376, 1380 (11th Cir. 1982); *see also United States v. Nelligan*, 573 F.2d 251, 253 (5th Cir. 1978); *United States v. Horton*, 601 F.2d 319, 323 (7th Cir.) (citing *United States v. Keen*, 508 F.2d 986, 989 (9th Cir. 1974)) ("A more restrictive state law would not affect the admissibility of such evidence in a federal court."); *United States v. Testa*, 548 F.2d 847 (9th Cir. 1977); *United States v. Shaffer*, 520 F.2d 1369, 1372 (3d Cir. 1975); *United States v. Neville*, 516 F.2d 1302, 1309 (8th Cir. 1975) ("[W]iretap or other evidence obtained without violating the Constitution or federal law is admissible in a federal criminal trial even though obtained in violation of state law.").

### E.    Impeachment of Witnesses

The Government intends to present the testimony of several witness in its case-in-chief, some of whom have been previously arrested and some of whom have sustained felony convictions. Further, at least one witness has an unresolved and pending criminal matter in another federal district.  The Government opposes any effort by the Defendant to attempt to impeach witnesses through arrests and

crimes for which they were not convicted, or to impeach witnesses by eliciting

testimony about the underlying facts of such criminal cases.

Under Federal Rule of Evidence 609(a), evidence that a witness other than

an accused has been convicted of a crime shall be admitted, subject to Rule 403, if

the crime was "punishable by death or imprisonment for more than one year," and

evidence that any witness has been convicted of a crime shall be admitted

"regardless of the punishment . . . if the court can readily determine that

establishing the elements of the crime required proving—or the witness's

admitting—a  dishonest act or false statement."  However, arrests are not

convictions; nor are pending, unresolved cases.  *See United States v. Head*, 755

F.2d 1486, 1489 (11th Cir. 1985) (upholding district court's decision to exclude

cross-examination regarding witness's outstanding state felony arrest under Rule

609). Moreover, the underlying factual basis for a prior conviction may be properly

limited by the court.  *See United States v. Fernandez-Leyva*, 482 F. App'x 417, 421

(11th Cir. 2012) (per curiam) ("The district court permitted [the defendant] to elicit

testimony concerning the nature and number of [a witness's] six prior felony

convictions, and only precluded further cross-examination into the details of some

of these prior convictions.  We find no abuse of discretion in the district court's

application of Rule 403."); *United States v. Lopez-Medina*, 596 F.3d 716, 737-38

(10th Cir. 2010) (trial court ruling that counsel could not question witness

concerning the facts and circumstances of the conviction, but could ask him

whether he expected to receive a reduced sentence based on his cooperation,

upheld on appeal); *see generally United States v. Benavides*, 470 F. App'x 782,

790 (11th Cir. 2012) (per curiam).

Unless the defense can articulate some good faith basis for attempting to

impeach a witness about prior arrests, dismissed charges, pending unresolved

charges, acquittals, non-qualifying convictions, or the underlying factual basis of

such cases, no witness should be cross-examined about such subjects.

### F.    Rule of Completeness

The Defendant made statements to law enforcement and to one of the

victims which were audio-recorded. During trial, the Government may introduce

portions of these recorded statements into evidence or may simply ask the law

enforcement witness or victim to testify about what the Defendant said.

Federal Rule of Evidence 106 provides that "[i]f a party introduces all or

part of a writing or recorded statement, an adverse party may require the

introduction, at that time, of any other part—or any other writing or recorded

statement—that in fairness ought to be considered at the same time." Fed. R. Evid.

106. However, Fed.R.Evid. 106 "'does not automatically make the entire

document admissible' once one portion has been introduced." *United States v.*

*Santos*, 947 F.3d 711, 729–30 (11th Cir. 2020) (quoting *United States v. Pendas-*

*Martinez*, 845 F.2d 938, 944 (11th Cir. 1988). Rather, Rule 106 "permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." *Id*. at 730 (quoting *United States v. Simms*, 385 F.3d 1347, 1359 (11th Cir. 2004)).

Rule 106 only applies when a written document is admitted into evidence, or when a document is used in such a way that is "tantamount" to introduction of the document itself. *United States v. Allen*, 416 F. App'x 875, 884 (11th Cir. 2011) (quoting *United States v. Ramirez–Perez*, 166 F.3d 1106, 1113 (11th Cir.1999)). Thus, the rule of completeness does not apply to statements made by the defendant to a witness, where the witness testifies about the statements that they personally heard the defendant make, and where the Government does not introduce any written or recorded statement of the defendant. *Id.*  In such instances Rule 106 does not apply because a prosecutor's questions to a witness about what the defendant said refer to conversations with the defendant rather than about what was written in the document or what a recording contains. *Ramirez-Perez*, 166 F.3d at 1113–14. Thus, trial courts do not abuse their discretion in allowing a witness to testify regarding inculpatory portions, but not exculpatory portions, of a defendant's statement. *Id.*

## VII.  NOTICE OF GOVERNMENT'S METHOD OF SUBMITTING EVIDENCE IN ITS CASE-IN-CHIEF - RECALLING WITNESSES

The Government's case-in-chief covers a number of crimes occurring over a two-year period. With the Court's permission, the Government intends to present evidence of the charged events in an organized manner. Specifically, the Government intends to present one or more witnesses for testimony relevant to the event currently being discussed during trial, excuse that witness, and recall that same witness later in trial when his or her testimony with respect to another crime becomes relevant. The Government has discussed this approach with defense counsel and understands that counsel has no objection to proceeding in this manner.

According to Fed.R.Evid. 611(a), "It is the responsibility of the court to control the mode and order of interrogating witnesses and the presentation of evidence so as to foster the ascertainment of truth, avoid needless consumption of time, and at the same time protect witnesses from harassment or undue embarrassment."  In dealing with the calling of multiple witnesses, "the entire matter of order or presentation of evidence and mode of witness examination rests largely in the discretion of the trial judge." *Id.*; *see also United States v. Jackson*, 549 F.2d 517, 528 (8th Cir.  1977). Moreover, "A trial court has discretion to exercise control over the order of interrogating witnesses to make the interrogation and presentation effective for the ascertainment of truth." *United States v. Puckett*,

147 F.3d 765, 770 (8th Cir. 1998); *see also United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (holding that the court did not abuse its discretion under Fed.R.Evid. 611(a) when the government recalled an agent to present his testimony sequentially because he was subject to cross-examination each time); *United States v. Edelin*, 128 F.Supp.2d 23, 47 (D.D.C. 2001) (stating that allowing the government to recall witnesses "[d]uring its case-in-chief seems to be the best way of providing a clear and orderly trial for the defendants and the prosecution" and collecting cases of similar practice in complex conspiracy cases). Ultimately, whether the prosecutor can recall witnesses is to be decided by the trial judge. Fed.R.Evid. 611(a).

These decisions have made it clear that if the recalling of witnesses will foster a clearer presentation of evidence for the jury to understand as well as promote the expedience of trial, it should be permitted. In this specific situation, as discussed *supra*, there are four groups of RICO predicate acts, and some of them will be testified about by the same witnesses. The presentation of evidence will be clearer to the jury and the court if the government is allowed to recall witnesses to testify to each act sequentially. Furthermore, this would allow the presentation of the prosecution's evidence to flow much faster and avoid jury confusion and a needless consumption of time. Therefore, the Government requests a pre-trial ruling allowing the Government to call and recall witnesses, when appropriate, so that

they may testify about each grouping of RICO predicate acts separately.

## VIII.  SUMMARIZING INDICTMENT AND PROVIDING COPY OF INDICTMENT TO JURY

The indictment in this case is 26 pages (including several pages containing the forfeiture allegations) and outlines the Government RICO allegations against the Defendant in detail. Given the complexity of this case and the various RICO predicate acts alleged, a concise summary of the indictment being read to the jury at the beginning of the trial would not help them understand precisely what crime is charged and what the trial is about. Rather, the Government requests that the Court read the following summary of the indictment to the jury at the beginning of the trial:

> On October 4, 2022, a grand jury in the Northern District of Florida returned an indictment charging Phillip Timothy Howard with one count of violating the Racketeer Influenced and Corrupt Organizations (RICO) Act, also known as "racketeering" or "substantive RICO," in violation of 18 U.S.C. 1962(c). The indictment alleges that during the relevant periods of time, Mr. Howard was associated with a group of individuals and entities referred collectively as "the Enterprise," which was engaged in, and whose activities affected, interstate and foreign commerce. The Enterprise is alleged to have consisted of Mr. Howard, Mr. Howard's law firm, Howard & Associates, and several Florida and Nevada investment companies (collectively referred to as the "Cambridge Entities"), as well as their associated employees and contractors. During the time period alleged in the indictment, Howard & Associates was engaged in civil litigation, including the class action litigation of cases on behalf of former NFL players who had suffered long-term injuries related to concussions they received from playing professional football. During the time period alleged in the indictment, the Cambridge Entities held themselves out to be investment companies which were investing in a variety of

securities, real estate, and technology.

The one count of RICO for which Mr. Howard is charged alleges 26 predicate acts (known as "Racketeering Acts"), consisting of wire fraud and money laundering, which are grouped into four categories. They are as follows:

As charged in Racketeering Acts 1-6c of the Indictment, the Government alleges that Howard & Associates and the Cambridge Entities were interdependent on each other. Specifically, the indictment alleges that on many occasions, former NFL Player clients agreed to retain Howard & Associates due to promises that they could receive settlement advances against their NFL concussion claims from the Cambridge Entities, and additionally, many Howard & Associates clients were solicited to invest their retirement funds with the Cambridge Entities. As part of this solicitation, Howard and other members of the Enterprise provided investment prospectuses to the clients which described the types of investments the Cambridge Entities allegedly made.

After investing with the Cambridge Entities, these same clients received periodic updates from the Cambridge Entities which described the value of the client's investment, the size of the total investment fund, and the client's assets as a percentage of the total fund. The indictment alleges that the prospectuses provided by the Cambridge Entities to the investors were materially false and misleading. Although the prospectuses issued by the Cambridge Entities claimed that the fund was investing in securities, real estate, and technology, in reality the fund was primarily used to issue settlement advance loans to former NFL players who had retained Howard & Associates to represent them in the NFL concussion class action lawsuit. The indictment alleges that this scheme resulted in some former NFL player clients investing their retirement funds with the Cambridge Entities under false pretenses, only to have their own investment money loaned back to them as a settlement advance loan, at interest rates as high as 30%.

Despite the fact that the Cambridge Entities' funding of settlement advance loans consisted of their primary investment, Mr. Howard did not disclose to his clients that he had manipulated data, and failed to comply with the terms of the NFL Concussion Settlement claims protocol and ethical standards. Specifically, Mr. Howard failed to disclose that baseline evaluations of former NFL players were conducted by a former client of Mr. Howard whose medical license was revoked, and failed to disclose that Mr. Howard and other members of

the Enterprise manipulated and overinflated impairment ratings of some former NFL player clients.

Mr. Howard also failed to disclose that the sole investment made by the Cambridge Entities in "technology" was actually an investment in a company called "Omnipad," which was jointly owned by Mr. Howard and another person, and that the Cambridge Entities' investment in "real estate" consisted of properties owned by Mr. Howard for personal use. The indictment further alleges that Mr. Howard, in his role with the Cambridge Entities, falsely represented the size of the investment fund and failed to disclose that almost none of the Cambridge Entities' investment funds yielded any return. On the contrary, Mr. Howard and other members of the Enterprise issued performance statements to the former NFL player clients in which it was falsely claimed that their investments had yielded a high rate of return. For the purpose of executing and attempting to execute the scheme, Mr. Howard caused certain wire transactions to be transmitted in interstate commerce. Through this scheme, Mr. Howard, along with others, obtained over $4 million to which they were not entitled.

The second category of predicate acts alleged in the Indictment, described in Racketeering Acts 7-10, alleges that Mr. Howard, along with other members of the Enterprise, sought settlement advance loans from Preferred Capital on behalf of the former NFL clients. Based heavily on the false and fraudulent information provided by Mr. Howard, Preferred Capital approved and provided loans to 25 of Mr. Howard's clients.

Specifically, Mr. Howard failed to disclose to Preferred Capital that: (1) player medical evaluations, which were critical underwriting documents, were the result of manipulation by Mr. Howard and his staff, (2) that the doctor used to conduct these evaluations did not have the proper board certification, (3) that the neurologist who signed off on final medical evaluations had rescinded all of his reports in May of 2017 due to ethical and financial concerns, and (4) that many players' impairment scores were significantly inflated. Mr. Howard also failed to disclose that he, through the Cambridge Entities, had already issued settlement advance loans to these same NFL player clients against their concussion claims. Mr. Howard also failed to disclose that he was soliciting clients to invest the loan they received from Preferred Capital with the Cambridge Entities, whose bank accounts were controlled by Mr. Howard.

For the purpose of executing and attempting to execute this

scheme, Mr. Howard caused certain wire transactions to be transmitted in interstate commerce. Through this scheme, Mr. Howard, along with others, obtained over $2 million to which they were not entitled.

The third sub-category of predicate acts alleged in the Indictment, described in Racketeering Acts 11-13, alleges that Mr. Howard, along with other members of the Enterprise, sought litigation funding loans from Virage Capital. Mr. Howard represented that these loans would be used by Howard & Associates to fund the previously-described NFL concussion class action litigation. In applications made to Virage Capital, Mr. Howard failed to disclose that: (1) player medical evaluations were the result of incorrect procedures and manipulation, (2) that the doctor used to conduct evaluations did not have the proper board certification, (3) that the neurologist who signed off on final medical evaluations rescinded all of his reports in May of 2017 due to ethical and financial concerns, and (4) that Mr. Howard commingled funds obtained from Virage Capital into accounts that he used for personal expenses and costs unrelated to litigation.

For the purpose of executing and attempting to execute this scheme, Mr. Howard caused certain wire transactions to be transmitted in interstate commerce. Through this scheme, Mr. Howard, along with others, obtained over $8 million to which they were not entitled. Mr. Howard is also alleged to have engaged in monetary transactions that involved criminally derived property over $10,000, specifically, the fraudulently-obtained loans from Virage Capital.

The fourth category of predicate acts alleged in the Indictment, described in Racketeering Acts 14-15, alleges that Mr. Howard, along with other members of the Enterprise, solicited an investment from J.I.E. for an alleged real estate project in Jacksonville, Florida. As part of this scheme, Mr. Howard falsely and fraudulently promised J.I.E. a 25% return on her investment within 60 days or a 50% return on investment in 120 days. In reliance on this false promise, along with Mr. Howard's false representations regarding how the investment would be used, J.I.E. transferred over $520,000 to him. Mr. Howard did not disclose to J.I.E. that the investment funds were not used for the real estate project, but rather were used for unrelated purposes, and he did not return any portion of J.I.E.'s money to her.

For the purpose of executing and attempting to execute this scheme, Mr. Howard caused certain wire transactions to be transmitted in interstate commerce. Through this scheme, Mr. Howard, along with others, obtained over $520,000 to which they were not entitled.

Additionally, the Government further submits that the jury would benefit both from being read the indictment in its entirety (except for the forfeiture allegations) during the court's final instructions, and by having a copy of the indictment (without the forfeiture allegations) during its deliberation. *See United States v. Kim*, 577 F.2d 473, 484 (9th Cir. 1978) (no abuse of discretion in permitting the jury to hear the entire indictment at beginning of trial and in the court's final closing instructions to the jury); *see also United States v. Scott*, 37 F.3d 1564, 1576 (10th Cir. 1994) ("With the admonition that the indictment is not evidence, courts seldom consider it an abuse of discretion either to read it to the jury or to allow them to have it during its deliberations, which was also done here."). Because of indictment's length and level of detail, the Government further suggests that each juror should be provided his or her own copy of the indictment to take back into the deliberation room. *See United States v. Utz*, 886 F.2d 1148, 1151–52 (9th Cir. 1989) ("We perceive no reason why the district court's decision to give each juror a copy of the indictment should not be accorded the same deference due a decision of the district court to send a single copy of the indictment to the jury room.")

It is not error for the trial judge to read the entire indictment to the jury as long as the judge also instructs the jury that the indictment is not to be considered as evidence. *United States v. Jones*, 587 F.2d 802, 805 (5th Cir. 1979). Moreover, a

court's instruction to the jury to read the indictment themselves, rather than reading it to them, does not prejudiced a defendant. *Id.* at 806; *see also United States v. Sutherland*, 656 F.2d 1181, 1202 (5th Cir. 1981[8]) (trial court's instruction the jury to read portions of the indictment for themselves upheld on appeal); *United States v. Luffred*, 911 F.2d 1011, 1016 (5th Cir. 1990) ("it is settled law…that a court may read an indictment in its entirety provided the jury is instructed that the indictment is not evidence[.]")

The decision to read an indictment to the jury is within the sound discretion of the trial court. *United States v. Polizzi*, 500 F.2d 856, 876 (9th Cir.1974). Especially in complex cases, a court's decision to read the indictment is not an abuse of discretion. *United States v. Atkinson*, 966 F.2d 1270, 1274 (9th Cir. 1992). Where a defendant is charged with a multiple or complex crimes, especially where the trial is lengthy, "the indictment along with the Court's instructions will provide the jury the framework necessary to weigh and analyze the evidence." *United States v. Daniels*, 159 F. Supp. 2d 1285, 1299 (D. Kan. 2001) (citing *United States v. Scott*, 37 F.3d 1564, 1577 (10th Cir. 1994) ("considering the number of overt acts charged and the number of defendants, it seems entirely appropriate that the court not only read the indictment to the jury but allowed the jury to have a copy

---

[8] Decided September 25, 1981—five days before the deadline established in *Bonner*, discussed in footnote 7, *supra*—thus, this is binding precedent on this court.

during its deliberations")); *see also United States v. Harvey*, 540 F.2d 1345, 1355

(8th Cir. 1976) ("[N]o prejudice was shown from the reading of the indictment by

the District Court as a part of its instructions, a practice which is within its sound

discretion."); *United States v. Parker*, 586 F.2d 1253, 1257 (8th Cir. 1978).

## IX.   JURY INSTRUCTIONS AND VERDICT FORM

The Government previously filed its proposed jury instructions and verdict

form on May 26, 2023. ECF Nos. 39-40.

Respectfully submitted,

JASON R. COODY
United States Attorney

*/s/ Justin M. Keen*
JUSTIN M. KEEN
Assistant United States Attorney
Florida Bar Number: 021034
111 North Adams Street, Fourth Floor
Tallahassee, FL 32301
Justin.Keen@usdoj.gov
(850) 942-8430

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I HEREBY CERTIFY that this memorandum complies with the type-volume limitation of Local Rule 7.1(F) because this pleading contains less than 8,000 words. In making this representation, I have relied upon the word count feature of Microsoft Office.

*/s/ Justin M. Keen*
JUSTIN M. KEEN
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed via the Court's CM/ECF system on this 28th day of July, 2023, which will send notification of such filing to all counsel of record.

*/s/ Justin M. Keen*
JUSTIN M. KEEN
Assistant United States Attorney